## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## AT WHEELING

GW Rentals, LLC
Windmill Truckers, Inc.
Lee J. Glessner, Gary W. Glessner,
Norma Tubaugh, Dawnisa Tubaugh,
Clarence Tubaugh,Glessner Real Estate
Properties, LLC, Kathy A. Elliott, and
Robert B. Elliot,

       Plaintiffs,

vs.

CLS Group, Capital Land Services, Inc.,
Chesapeake Appalachia, L.L.C.,
Chesapeake Energy Corporation,
Southwestern Energy Company, individually
and as Successors in Interest to Chesapeake
Appalachia, LLC and Chesapeake Energy
Corporation, Southwestern Energy,
individually and as Successors in Interest to
Chesapeake Appalachia, LLC and
Chesapeake Energy Corporation,
Southwestern Energy Production Company,
individually and as Successors in Interest to
Chesapeake Appalachia, LLC and
Chesapeake Energy Corporation, and
Southwestern Energy Services Company,
individually and as Successors in Interest to
Chesapeake Appalachia, LLC and
Chesapeake Energy Corporation

       Defendants.

CIVIL ACTION NO. 5:14-CV-154

## PLAINTIFFS' FIRST AMENDED COMPLAINT



1

Now comes the plaintiffs by and through there undersigned counsel, Mark A. Kepple, Esquire, and the law firm of Bailey & Wyant, P.L.L.C. and for their first Amended Complaint state and allege as follows:

1.      The plaintiff, GW Rentals, LLC is a West Virginia limited liability company that owned or is currently owning real property and mineral interests and engaging in business activities in Ohio County, West Virginia.

2.      The plaintiff, Windmill Truckers, Inc. is a West Virginia corporation owning real property and mineral interests and doing business in Ohio County, West Virginia.

3.      The defendant, Lee J. Glessner is a real property and mineral owner in Ohio County, West Virginia.

4.      The plaintiff, Gary W. Glessner is a real property and mineral owner in Ohio County, West Virginia.

5.      The plaintiffs, Gary W. Glessner, Norma Tubaugh, and Clarence Tubaugh are mineral and real property owners of Marshall County, West Virginia. Norma Tubaugh and Clarence Tubaugh are Marshall County, West Virginia residents.

6.      The plaintiff, Dawnisa Tubaugh, is a mineral and real property owner with a lease to the Chesapeake entities and is domiciled and a resident of the State of Texas.

7.      The plaintiffs, Kathy A. Elliot and Robert B. Elliott are mineral and real property owners and residents of Marshall County, West Virginia.

8.      The Plaintiff, Glessner Real Estate Properties, LLC is a West Virginia limited liability company owning real property and mineral interests and doing business in Ohio County, West Virginia.



2

9.    The parties identified above in paragraphs 1-8 shall hereinafter be referred to as "Glessner."

10.    The defendant, CLS Group, also known as Capital Land Services, Inc. is a West Virginia corporation doing business in Ohio County, West Virginia, hereinafter referred to as "Capital."

11.    Chesapeake Appalachia, LLC is a West Virginia limited liability company doing business in Ohio County, West Virginia, hereinafter referred to as "Chesapeake." Chesapeake Appalachia, LLC, also maintains a principal place of business in the State of West Virginia.

12.    Chesapeake Energy Corporation does business in Ohio County, West Virginia, hereinafter referred to as "Chesapeake." Chesapeake Energy Corporation also maintains a principal place of business in the State of Texas.

13.    Chesapeake Energy Corporation does business in Ohio County, West Virginia.

14.    Chesapeake Appalachia, LLC does business in Ohio County, West Virginia.

15.    Southwestern Energy Company is a foreign corporation that is a citizen domiciled in the State of Texas and having its principal place of business located in Texas. The State of Texas is where the Southwestern Energy Company's officers direct, control, and coordinate the corporation's activities.  The State of Texas is the place where the corporation maintains its headquarters and is the actual center of direction, control, and coordination, *i.e.,* the 'nerve center,' and not simply an office where the corporation holds its board meetings.

16.    Southwestern Energy Services Company is a foreign corporation that is a citizen domiciled in the State of Texas and having its principal place of business located in Texas. The State of Texas is where the Southwestern Energy Services Company's officers direct, control, and coordinate the corporation's activities.  The State of Texas is the place where the corporation



3

maintains its headquarters and is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings.

17.     Southwestern Energy Production Company (SEPCO) is a foreign corporation that is a citizen domiciled in the State of Texas and having its principal place of business located in Texas. The State of Texas is where the Southwestern Energy Production Company's officers direct, control, and coordinate the corporation's activities. The State of Texas is the place where the corporation maintains its headquarters and is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings.

18.     Jurisdiction and venue in Ohio County, West Virginia is appropriate.

19.     CLS Group/Capital Land Services, Inc. and Chesapeake utilized a West Virginia Notary, and upon information and belief, to contact plaintiffs in Ohio County, West Virginia and ultimately acquired their signatures on certain leased properties in Ohio County, West Virginia and properties located in Marshall County, West Virginia.

20.     The plaintiffs do not assert any claims which are federal claims or federal causes of action. The plaintiffs seek no relief under any federal laws or regulations, asserts no federal claims, and withdraws any asserted state law claims that are preempted by federal law.

21.     Chesapeake Appalachia, LLC, maintains a principal place of business in West Virginia and is therefore a citizen, resident, and is otherwise Domiciled in the State of West Virginia, as are many of the plaintiffs, thus, Diversity of Citizenship does not exist.



22.     As Southwestern Energy Company is a Texas corporation and Dawnisa Tubaugh is a Texas resident and citizen, there is no diversity of citizenship.

4

23.     As Southwestern Energy Services Company is a Texas corporation and Dawnisa Tubaugh is a Texas resident and citizen, there is no diversity of citizenship.

24.     As Southwestern Energy Production Company is a Texas corporation and Dawnisa Tubaugh is a Texas resident and citizen, there is no diversity of citizenship.

25.     Chesapeake Energy Corporation also has a principal place of business in the State of Texas and Dawnisa Tubaugh is a Texas resident and citizen; thus, there is no diversity of citizenship.

26.     Beginning at or around the time preceding August 2008 a representative of CLS Group, also known as Capital Land Services, Inc., and Chesapeake Appalachia, LLC, and Chesapeake Energy Corporation, contacted the plaintiff landowners in an effort to acquire mineral leases for only the Marcellus Shale mineral interests.

27.     CLS Group/Capital Land Services, Inc. and Chesapeake determined that GW Rentals, LLC, Windmill Truckers, Inc., Lee J. Glessner, Gary W. Glessner, Norma Tubaugh, Dawnisa Tubaugh, Clarence Tubaugh, Kathy A. Elliott and Robert B. Elliott held a combined acreage of mineral interests according to various degrees of ownership, totaling approximately 743.711 acres.

28.     The Defendants began to make offers, representations, and present leasing options to the plaintiffs in an effort to induce the plaintiffs into signing a lease of their mineral interests favoring Chesapeake.

29.     The agent and representative of CLS Group, and Capital Land Services, Inc. represented that he had full authority, permission and control necessary to enter into lease agreements on behalf of CLS Group, Capital Land Services, Inc., Chesapeake Appalachia LLC, and Chesapeake Energy Corporation.  In so doing, he also indicated that he understood what was



5

best for landowners in Ohio County, West Virginia and particularly, these plaintiffs. CLS Group, Capital Land Services, Inc. and the Chesapeake Entities indicated that signing the lease in 2008 on the terms as explained to the plaintiffs was best for the plaintiffs.

30.     Additionally, CLS Group/Capital Land Services, Inc. also indicated that signing early compared to others in the community and for what is now known to be a much lower per acre up-front payment amount than what other similarly situated landowners were receiving would be in the best interest of these plaintiffs. Further, it was represented that the lease could be modified wherein the lease would remain open for further negotiations after the expiration of its original term in 2013. CLS Group/Capital Land Services, Inc. understood this would be particularly beneficial to the plaintiffs and would entice them to sign. Plaintiffs agreed to this modification of the form lease contract so that a renegotiation of the upfront signing bonus and royalty percentage could be done. The plaintiffs indicated that it was their preference not to encumber their property and enter into a mineral lease on perpetual terms, or automatically renewing terms. The plaintiffs herein trusted the CLS Group, Capital Land Services, Chesapeake Appalachia, LLC and Chesapeake Energy Corporation that the lease that they were being presented provided that opportunity and enabled the plaintiffs to renegotiate on favorable terms at the expiration of the five year lease term. In this regard, plaintiff's believed and were advised that the striking out and initialing of the "Extension of Primary Term" clause and changing the lease term from seven (7) to five (5) was the manifestation of this agreement. *See Lease agreements attached hereto and incorporated herein as Exhibits A-I by reference. See also exemplar excerpt below:*



> specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.
>
> ~~EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.~~
>
> NO AUTOMATIC TERMINATION OR FORFEITURE.
>
> (A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration

31. CLS Group, Capital Land Services, Chesapeake Appalachia, LLC and Chesapeake Energy Corporation made a representation that he had altered the terms of the form lease in such a way that the lease would expire five years from the date of signing and require the terms to be renegotiated for any operations to continue. As a representative of the CLS Group, Capital Land Services, Chesapeake Appalachia, LLC and Chesapeake Energy Corporation, made representations that entering into a lease for what is now known to be a comparably low, per acre amount such as the amount of compensation as shown in Exhibits A-G (during what was represented as the initial wave of Marcellus Shale leasing) was in the best interest of the plaintiffs. The explanation provided that because, at the expiration of the five year period of time, the parties could re-lease in the "boom" period of the Marcellus Shale leasing for a higher per acre up front bonus payment. Representations were made that, in other areas of the country where leasing of natural gas interests had occurred, this scenario had been played out successfully and land owners would be able to make more money from their mineral interests. The plaintiffs believed that CLS Group, Capital Land Services, Chesapeake Appalachia, LLC and Chesapeake Energy Corporation were acting in their best interest, and that was acting as the authorized agent in between, as an intermediary and business agent in their dealings Chesapeake Appalachia, LLC and Chesapeake Energy Corporation, and Capital. In

reality, it is believed that CLS Group, Capital Land Services, or the Chesapeake entities, were acting in pursuit of their interests and in a way actually adverse to the plaintiffs.

32.    The Chesapeake entities retained the CLS Group, Capital Land Services to obtain leases on the most favorable terms possible for Chesapeake.

33.    The Chesapeake entities ratified, endorsed and adopted the conduct and representations of the CLS Group, Capital Land Services.

34.    Upon information and belief these defendants have a course of conduct and series of business practices that are specifically calculated to acquire mineral leases in a manner that is harmful and offensive to West Virginia mineral owners.

35.    The Chesapeake entities have made money and profits off of West Virginia mineral interest owners, and specifically these plaintiffs in this particular case, by such tactics and business practices.

36.    The Chesapeake entities have refused to enter into a subsequent mineral lease term with the plaintiffs as per the representation of Chesapeake's agent, CLS Group, Capital Land Services.

37.    The Chesapeake entities and CLS Group/Capital Land Services, Inc. submitted adhesion form leases that they modified in plaintiffs' presence to change the term of the lease to a single term of 5 or in some cases 7 years as described herein. This strategy was specifically employed with these leased parties and in similar regard with other West Virginia mineral owners as a part of an overall strategy to dupe West Virginia mineral owners to enter into unfavorable lease terms, an unconscionable contractual agreement complete with an unfair arbitration clause. The lease specifically provided for a mechanism for the lease to end with the



8

expiration of the 5 or 7 year term and also provided with other mechanisms to be employed upon a claim that the lease is terminated.  See below:

> (B) LIMITATION OF FORFEITURE:  This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice.  If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.
>
> PAYMENTS TO LESSOR   In addition to the bonus paid by Lessee for the execution to of t

This language specifically provides that a civil action be filed after the Lessee has received written notice of the Lessor's demand and 60 days pass.  In this case, written notice was sent of the termination, forfeiture, and expiration of the lease.  Chesapeake acknowledged receipt of the written notice and essentially ignored the same triggering the dispute resolution mechanism of sub-paragraph (B) of the subject leases.

The anticipated reliance of Chesapeake and other interested parties on the "ARBITRATION" clause is part of the systematic approach to bury their deceptive and unconscionable tactics to obtain an unfair advantage against West Virginia property owners.

The Arbitration clause, individually, and read *pari materia* as part of the entire document, particularly the civil action provisions of the "FORFEITURE" clause of the contract is void, unenforceable, and unconscionable.

38.    The Original lease term of August 8, 2008 to August 8, 2013 has expired and the Chesapeake Entities have not paid any consideration for their continued and unlawful occupation of the property.



39.     Upon information and belief the Chesapeake entities and Capital have engaged in this or similar business practices and course of conduct in a systematic way as part of a strategy to obtain leases on mineral interest on West Virginia properties.

40.     Upon information and belief the Chesapeake entities have installed a well pad to extract minerals from all or some of the properties held by the plaintiff. Specifically, the GW Rentals, LLC parcel has what is believed to be an operating well site, but Chesapeake has neither paid any royalties from said property nor made any effort to establish a division order consistent with any lease agreement, even the now expired August 2008-2013 lease agreement.

41.     On the GW Rentals, LLC site, it appears that flammable gasses are being burnt off, fluids are being stored and/or transported and gasses are being monitored, measured and transferred from the site via a system of pipelines and/or motor carriers. Further, it appears that a caravan of 18 wheeler ladened tanker trucks leave the site on what seems like a daily basis.

42.     No compensation has been paid pursuant to the GW Rentals, LLC lease, Gary W. Glessner lease, Lee J. Glessner lease, or Windmill Truckers Inc. lease.

43.     No compensation has been paid to extend, renew, lease, or satisfy terms of prior leases to extend the lease beyond its 5 year term.

44.     Chesapeake has encumbered the title to the plaintiffs' mineral interests with these recorded leases thereby communicating to other leasing entities that the property is leased and unavailable.

45.     Due to the presence of the alleged lease on the chain of title, the plaintiffs have been unable to lease with other companies paying a higher per-acre lease and royalty percentage than these defendants. This has caused a loss and damage to these plaintiffs.



10

## **Count I – Breach of Contract**

The plaintiffs restate and re-allege the preceding allegations of plaintiff's complaint as if restated fully herein.

46. The plaintiffs and defendants had a contract to pay mineral royalties stemming from the leases attached hereto and incorporated herein.

47. Upon information and belief, the defendants have produced natural gas and liquids from the plaintiff's property. No payment, division order, or other indicia that any monetary consideration will be exchanged has occurred.

48. The failure to pay the plaintiffs is a breach of the contract.

49. The failure to pay for the natural gas and liquids taken from plaintiff's property is a breach of contract and has caused damage to these plaintiffs.

50. The contract lease agreement also provided that if there is any dispute about the extension of the lease beyond what is termed as the "primary term" that "payment of the prescribed payments provided below shall be conclusive evidence that the lease has been extended beyond the primary term." *See leases generally.*

51. The payments clause is as follows:

the disputes, carve back claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating


Bailey
&Wyant
ATTORNEYS AT LAW

52.     In part because the form "Extension of Primary Term" clause had been stricken from the document, this means that that the parties agreed to re-negotiate any continuing leasing of the subject property.

53.     As is plainly apparent the payments to the lessor include, "[i]n addition to the bonus paid by Lessee", Delay Rental and Royalties.  Thus, in order to extend this lease beyond its primary term, a Bonus Payment must be paid again, in addition to Delay Rentals, and/or Royalties, if applicable.  Chesapeake, by and through its agent CLS Group agreed to this Lease extension procedure and have failed to perform.

54.     No bonus payment for the period after August 2013 has been made.

55.     No payments for royalties has been made or received.

56.     The above actions and inactions constitute a breach of the parties' agreement and the plaintiffs have suffered harm and damages due to said conduct.

57.     The plaintiffs have been forced to retain legal counsel and file suit to seek a remedy for the damages sustained herein.

### Count II – Conversion

The plaintiffs restate and re-allege the preceding allegations of plaintiff's complaint as if restated fully herein.

58.     The defendants have willfully interfered with the plaintiff's mineral rights.

59.     Once the lease expired and was not extended, the defendant's lawful justification to be on the subject property and extract minerals ended as a matter of law.  The continuing occupation of the plaintiff's property and harvesting of natural gas and other liquids deprives the plaintiffs from their full rights of ownership and control.



12

60.   As a direct and proximate result of the defendants' conduct herein, the plaintiffs have been deprived of their property and suffered damages due to such conduct.

61.   As a direct and proximate result of the defendants' conduct, they have taken control over the plaintiff's property and converted it to their use in a manner contrary to law.

## Count III- Ejectment

The plaintiffs restate and re-allege the preceding allegations of plaintiff's complaint as if restated fully herein.

62.   The defendants have no legal right to be on the subject property.

63.   The defendants have breached their contract/lease which provided initial right to possession.

64.   The defendants have failed to honor the terms of their lease.

65.   The defendants have failed to extend the lease beyond its primary term of 5 years.

66.   The defendants continue to occupy the subject property.

67.   The plaintiff is entitled to the full and unfettered use, possession, and control of their premises.

68.   The plaintiff is entitled to an order from this Court requiring the immediate ejection from the subject premises.

69.   The plaintiff was forced to incur attorney's fees to secure the property.

## Count IV – Slander of Title

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

70.   The defendants have recorded leases in the plaintiffs' chain of title

71.   The defendants have no legal right to claim a lease to the subject property.



13

72.     The plaintiff is unable to acquire other leasing opportunities so long as the defendants lease is recorded without a "release".

73.     The defendants have published information within the defendants' chain of title that is not true and such actions have markedly affected the monetary value of such property.

74.     The plaintiff has suffered an immediate financial harm as they are unable to sign with other leasing parties and are otherwise limited in the use of their property.

### Count V – Interference with Business Relationship

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

75.     The plaintiffs made an agreement with the defendants to enter into negotiations and/or terminate the lease at the expiration of the term.  Defendants have willfully and intentionally refused to re-negotiate these leases or extend the term thereof.

76.     The plaintiffs provided the defendant Chesapeake with an opportunity to avoid this litigation, but Chesapeake declined. *See Ex. J.*

77.     The defendants know that no other entity will lease the subject property so long as the Chesapeake leases are on record.  The defendants know that the plaintiffs are unable to secure the total economic value of their property so long as Chesapeake claims a right of possession.

78.     The defendants are intentionally claiming a right to possession and a leasehold interest with knowledge that the lease is expired.

79.     The defendants' actions not only frustrate and interfere with the business relationship *vis a vis* the original lease transaction, but also interferes with the plaintiffs' ability to market and secure other leases for the involved mineral interests.



14

80.     As a direct and proximate result of the defendants' conduct, the plaintiffs have suffered damages, lost profits, lost rentals, lost opportunity costs, and incurred attorney's fees.

### Count VI – Breach of Fiduciary Duty

The plaintiffs restate and re-allege the preceding paragraphs as if restated herein.

81.     The agent of CLS Group/Capital Land Services Inc., individually, and as a representative of the other defendants held himself out as an agent of Chesapeake indicating that he had a special relationship with the "gas company" that other landmen did not have.

82.     CLS Group/Capital Land Services Inc., indicated to plaintiffs that he was looking out for them and that signing the lease on these terms was in the best interest of the plaintiffs.

83.     Plaintiffs indicated that they were trusting CLS Group/Capital Land Services Inc., and valued what it had represented.

84.     Plaintiffs trusted CLS Group/Capital Land Services Inc., to draft the lease that reflected the terms that they agreed to such as a five year term and a requirement that the parties re-negotiate bonus money and the royalty percentage at the expiration of the five year term.

85.     Plaintiff's agreed to a $1,000 an acre lease and a 12.5% royalty percentage because CLS Group/Capital Land Services Inc., told them that such payments were the best offer and that if they did not sign, they would be left out.

86.     Because of these representations, CLS Group/Capital Land Services Inc., acquired the plaintiffs' trust and their signatures to the lease.

87.     Upon information and belief, in reality CLS Group/Capital Land Services Inc., was not acting on plaintiffs' best interest but had a profit incentive for themselves, and the Chesapeake entities.



88. CLS Group/Capital Land Services Inc., and the other defendants breached a fiduciary duty he owed to these plaintiffs.

89. As a direct and proximate result of the conduct described herein, CLS Group/Capital Land Services Inc., and the other defendants caused damages.

90. Plaintiffs were damaged as a result of the conduct alleged herein.

### Count VII – Breach of Covenant of Good Faith and Fair Dealing

The plaintiffs restate and re-allege the preceding paragraphs as if restated herein

91. There is an implied covenant of Good Faith and Fair Dealing between these defendants and the plaintiffs.

92. The parties had a contractual relationship with each other.

93. The defendants had a duty and legal responsibility to represent facts, positions, and offers reasonably, honestly and fairly to these plaintiffs.

94. The defendants had a duty and legal responsibility to honor their agreement with the plaintiffs and agree upon terms for the extension of the primary term and the royalty percentage.

95. The defendants breached their covenant of good faith and fair dealing by misrepresenting information during the negotiation process and failing to honor the agreement as described herein.

96. As a direct and proximate result of the conduct alleged herein the defendants caused plaintiffs to sustain damages.

97. The plaintiffs suffered damages.



16

## County VIII – Unauthorized Practice of Law

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

98.     During the negotiation process, the plaintiffs requested changes in the form lease.

99.     CLS Group/Capital Land Services Inc.,, individually and as duly authorized representative of the defendants, indicated that he would be able to make the changes and that Chesapeake agreed to the terms plaintiffs requested.

100.     Plaintiffs requested changes to the form lease and Defendants volunteered changes that provided that the lease would only last for 5 years and that at the expiration of 5 years, the parties would re-negotiate the up-front bonus money and the royalty percentage.

101.     CLS Group/Capital Land Services Inc., modified the form lease and represented that such modifications had a legal significance and would require the defendants to re-negotiate the up-front bonus money and the royalty percentage for any term extending past the primary term of the lease.

102.     Upon information and belief CLS Group/Capital Land Services Inc., relied upon its landman who is not a lawyer admitted to practice before the West Virginia Bar to make these representations and take these actions that constitute the unauthorized practice of law.

103.     CLS Group/Capital Land Services Inc., was engaged in the practice of law when he told the plaintiffs what clauses in this contract meant, what modifications were necessary to document and memorialize the agreement they reached, and when he represented what his client (Chesapeake) would agree to.

104.     Due to the legal advice CLS Group/Capital Land Services Inc., gave to the plaintiffs, the plaintiffs signed the leases which Chesapeake apparently disagrees as to their meaning.



17

105. CLS Group/Capital Land Services Inc., and the defendants violated the law governing the practice of law in West Virginia and caused the plaintiffs damages as a result thereof.

106. Due to the inappropriate, illegal, and unauthorized actions of CLS Group/Capital Land Services Inc., the lease agreements are void and/or voidable and the arbitration clause contained within the leases is unenforceable.

107. The plaintiffs suffered damages.

### Count IX – Negligent and/or Intentional Misrepresentation

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

108. CLS Group/Capital Land Services Inc., individually and as representative of these defendants misrepresented the meaning of the lease agreements as referenced and discussed herein.

109. In justifiable reliance, these defendants relied upon these negligent and/or intentional misrepresented the terms of the lease in an effort to induce the plaintiffs' to sign the leases.

110. Plaintiffs signed the leases based upon the representations of CLS Group/Capital Land Services Inc., as discussed herein.

111. Plaintiffs suffered damages as a result of the negligent and/or intentional misrepresentations by the defendants.

112. The misrepresentations by the defendants caused the plaintiffs harm as discussed herein.



18

## Count X – Breach of Lease

The plaintiffs restate and reallege their allegations as if fully restated herein.

113.    The defendants have no legal right to be on the subject property.

114.    The defendants have breached their contract/lease which provided initial right to possession.

115.    The defendants have failed to honor the terms of their lease.  The defendants have failed to pay the necessary consideration to extend the lease beyond its primary term.

116.    The defendants have failed to agree to an amount of "bonus" payment to extend the term of the lease.

117.    The defendants have failed to extend the lease beyond its primary term of 5 years.

118.    The defendants continue to occupy the subject property.

119.    The plaintiff is entitled to the full and unfettered use, possession, and control of their premises.

120.    The plaintiff is entitled to an order from this Court requiring the immediate ejection from the subject premises.

121.    The plaintiff was forced to incur attorney's fees to secure the property.

## Count XI – Improper Notary Voids Lease

The plaintiffs restate and reallege the preceding allegations as if fully restated herein.

122.    CLS Group/Capital Land Services Inc.,, individually and as a representative of the defendants, had a disqualifying interest in the instrument (the lease) which he acknowledged and notarized. *See notary block on affected leases.*



123.    The plaintiffs have suffered actual prejudice and have otherwise been victimized by the unfair dealing by these defendants.

19

124.    The plaintiffs have suffered actual prejudice and otherwise been victimized by the undue advantage obtained by these defendants.

125.    The conduct herein has caused damages to the plaintiff.

126.    The improper notary voids the lease.

### Count XII – Trespass

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

127.    The defendants have no legal right to be on the subject property.

128.    The leases affecting the subject mineral interests are void or expired.

129.    The plaintiff is entitled to the full and unfettered use, possession, and control of their premises.

130.    The defendants are trespassing on plaintiffs' property.  The defendants have caused plaintiff damages.

131.    The plaintiffs are entitled to an order from this Court requiring the immediate ejection from the subject premises.

132.    The plaintiffs were forced to incur attorney's fees to secure the property.

### Count XIII – Liability of the Southwestern Energy Defendants

The plaintiffs restate and re-allege their specific allegations as if restated fully herein.

133.    Southwest Energy, Southwest Energy Company, Southwest Energy Production Company, and Southwest Energy Services Company, are all referred to herein collectively as "SWN".

134.    SWN, by and through SEPCO, acquired approximately 413,000 net acres of oil and gas interest in Northern West Virginia and Southwestern Pennsylvania targeting natural gas, natural gas liquids and crude oil contained in the Upper Devonian, Marcellus



20

and Utica shales for a payment to the Chesapeake entity(s) of approximately $5.375 billion dollars.

135.     SWN holds an equitable and legal interest in Chesapeake's alleged acquisitions and leases, including, to the extent a lease exists on the plaintiff's property. SWN is a successor in interest to the Chesapeake entities and/or assignee of the plaintiff's mineral leases. SWN stands in the shoes of the Chesapeake entities.

136.     Full relief among all parties cannot be granted without SWN as a party defendant in this case.

137.     There is a glimmer of hope that a claim could succeed by any plaintiff against SWN.

138.     SWN, by the purchase agreement with the Chesapeake entities, assumes the liabilities of the defendants CHK and Capital Land Services and CLS Group.

139.     SWN has paid hundreds of millions of dollars in performance of their obligation of their purchase agreement.

140.     By virtue of the purchase agreement SWN has a legal interest in the lease with the plaintiffs and ratifies, adopts and assents to the actions of CHK and the other defendants.

141.     SWN is/will be liable for the damages caused by CHK and Capital Land Services and CLS Group.

142.     As the holder of the alleged leases on the plaintiffs' property, SWN will be the entity(s) responsible for causing the harm of which plaintiffs complain herein.

143.     Upon information and belief, all or part of the plaintiff's acreage is contemplated and transferred pursuant to this transaction.



21

144.    Upon information and belief, now and upon completion of the sale SWN will
have failed to pay the lease extension amounts contemplated by the leases herein.

145.    The substantive allegations against the Chesapeake Entities are restated herein
against SWN.

146.    SWN has/will cause(d) the plaintiff's damages as contemplated herein.

**Count XV – Arbitration Clause is void, unenforceable, unconscionable**

147.    The Arbitration clause as contained in the leases attached in the leases is void,
unenforceable, and unconscionable.

148.    CHK included an ambiguous Arbitration clause in its lease agreements that is
unfair in its scope and application. The Arbitration clause is included in the lease
agreements as a critical element of CHK's overall strategy to unfairly take away West
Virginia mineral rights owners ability to pursue litigation in a public forum to expose the
tactics employed by CHK to convince unsuspecting mineral rights owners to sign unfair,
one sided leases.

149.    CHK's Arbitration provisions are in direct conflict and otherwise unenforceable
in this application because other language in the lease identifies an alternative mechanism
to address the termination of the lease. As the Arbitration clause in the subject lease in
this case does not address the specific circumstance in this case or is otherwise
ambiguous as to its scope and meaning, it must be stricken from the contract and not used
as a means to divest the plaintiffs of their Constitutional rights to address their claims in
an open forum.



150.　　The subject clause provides as follows:

> ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.
> ENTIRE CONTRACT.

151.　　In this circumstance the terms "disagreement between Lessor and Lessee concerning this Lease," is undefined and if given a generous tolerance to its traditional meaning would not be interpreted to apply to the circumstance present in the subject case, i.e. termination or expiration of the lease. The term disagreement simply means to participate in the act of disagreeing, or to be at a "state of being at variance".[1] Under the substantive law of West Virginia a clause with such unilateral and unequal terms is procedurally and substantively unconscionable and insufficient to support an Order compelling arbitration.

152.　　The Arbitration clause provides the limited circumstances that may be arbitrated to include performance under the lease and damages caused by operations. These two undefined conditions are void due to ambiguity, and if given their ordinary meaning, are contrary to the substantive law of West Virginia on grounds that such clause is procedurally and substantively unconscionable and insufficient to support an Order compelling arbitration.

153.　　The Arbitration clause is also in conflict with the other clauses contained within the leases such that the Arbitration clause and the mere inclusion of it in the lease is further evidence that it is included in the lease to dupe and confuse the lease signers and to deprive them of their rights to trial.



---

[1] www.merriam-webster.com/dictionary/disagreement.

154.     The Arbitration clause was not explained.  While the defendants made representations about the legal meaning of many other clauses, such representations were in direct conflict with the meaning of the Arbitration clause as the defendant CHK and its related entities have historically implemented the clause.  As the involved defendants were engaged in the unauthorized practice of law and made representations concerning the lease, the failure to fully and adequately explain all elements of the lease, including the import and application of the Arbitration Clause adds to the unconscionable nature of the clause, its meaning and application.  Thus, the clause should be stricken from the document.

## Count XIV - Damages

The plaintiffs restate and re-allege the preceding allegations as if restated fully herein.

155.     The conduct, actions, and inactions described above reflect a breach of a legal responsibility to the plaintiffs that caused damages.

156.     Plaintiffs are entitled to an award of attorney's fees and costs.

157.     Plaintiffs are entitled to immediate unfettered possession of the subject property.

158.     Plaintiffs are entitled to the market value of all liquids and gasses accessible in the Marcellus Shale formation.

159.     Plaintiffs are entitled to the market value of upfront bonus money for the extension of the primary term.

160.     Plaintiffs are entitled to compensatory and punitive damages for breach of fiduciary duty.



161.    Plaintiffs are entitled to compensatory and punitive damages for breach of implied covenant of good faith and fair dealing and breach of fiduciary duty.

162.    Plaintiffs are entitled to compensatory damages for breach of contract and breach of lease.

163.    Plaintiffs are entitled to compensatory and punitive damages for slander of title and negligent and/or intentional misrepresentation.

164.    Plaintiffs are entitled to compensatory and punitive damages for tortious interference with business relationship.

165.    Plaintiffs are entitled to compensatory and punitive damages for the unauthorized practice of law and improper notary claim.

166.    Plaintiffs are entitled to compensatory and punitive damages for trespass.

167.    Plaintiffs are entitled to compensatory and punitive damages for defendants' conversion of their property.

168.    Plaintiffs are entitled to damage for the lost business opportunity for the market value of the property and the mineral interest.

169.    Plaintiffs are entitled to general damages, lost profits, annoyance and inconvenience, and any other damages awardable by law.

170.    Plaintiffs are entitled to proceed with this civil action without arbitration.

**WHEREFORE,** the plaintiffs respectfully request that this Court issue Judgment against the defendants, find the leases Abandoned, Expired, Abandoned and Void, ORDER the immediate eviction of the defendants from the property, AWARD compensatory damages, AWARD lost royalties, AWARD damages for conversion of mineral interest, damage to property, trespass, breach of contract, economic loss, opportunity cost, annoyance and



25

inconvenience, and all other compensable damages allowable by law, including punitive and

exemplary damages, with pre and post judgment interest thereon until paid in an amount in

excess of the jurisdictional limits of this Court plus attorney's fees and costs.


THE PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES AND DAMAGES.


> GW Rentals, LLC
> Windmill Truckers, Inc.
> Lee J. Glessner, Gary W. Glessner,
> Norma Tubaugh, Dawnisa Tubaugh,
> Clarence Tubaugh, Glessner Real Estate
> Properties. LLC, Robert B. Elliott, and
> Kathy A. Elliott
> By Counsel.


Mark A. Kepple, Esq.
WV Bar Id. 7470
Bailey & Wyant, P.L.L.C.
1219 Chapline Street
Wheeling, WV 26003
Phone: (304) 233-3100
Fax: (304) 233-0201
mkepple@baileywyant.com



## CERTIFICATE OF SERVICE

I certify that I have served the appearing parties by filing the same in the ECF system.

Mark A. Kepple, Esq.
WV Bar Id. 7470
Bailey & Wyant, P.L.L.C.
1219 Chapline Street
Wheeling, WV 26003
Phone: (304) 233-3100
Fax: (304) 233-0201
mkepple@baileywyant.com



BOOK **788** PAGE **704**

**PAID-UP**
**OIL & GAS LEASE**

Lease No. **256014**

5/08 - WV

This Lease, made this **7** day of **Aug**, 20**08**, by and between Leo J. Glessner, a married man dealing in his sole and separate property and Gary W. Glessner, a married man dealing in his sole and separate property, whose address is Box 128 Valley Grove, West Virginia 26060, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

**DESCRIPTION.** The Leasehold is located in the District of Triadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: T9/5

and is bounded formerly or currently as follows:
On the North by lands of GW Rentals and Multiple Parcels of Land;
On the East by lands of Multiple Parcels of Land;
On the South by lands of Multiple Parcels of Land;
On the West by lands of Windmill Truckers Center, Inc.;

including lands acquired from Bernard J. Miller by virtue of deed dated November 21, 1969, and recorded in Deed Book 510, at Page 460, and described for the purposes of this agreement as containing a total of 78.519 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M. **Aug 7** , 20**08** (effective date) to 11:59 P.M. **Aug 6** , 20**13** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.
If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

~~**EXTENSION OF PRIMARY TERM.** Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extended this Lease beyond the primary term.~~

**NO AUTOMATIC TERMINATION OR FORFEITURE.**
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval processes required for conducting such activities).
(B) LIMITATION AND/OR FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

~~PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:~~

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.
2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating

EXHIBIT
A


BOOK 788 PAGE 705

liquid hydrocarbons from gas, other than condensate separated at the well, and (e) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessor may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay either the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay In Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for consecutive production, pay a Shut-In Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-In, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-In Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of this Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessee recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon of any differing tenure which Lessee has or will negotiate with any other lessor(s)] and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire and undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production on the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-In Royalty, Delay In Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands comprising the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessee shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to the Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK 788 PAGE 706

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warration, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon such surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to be in conformity with all laws, rules, regulations and orders and interpreted as such. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

| Witness | _____ | _____ (Seal) |
| Witness | _____ | _____ (Seal) |
| Witness | _____ | _____ (Seal) |
| Witness | _____ | _____ (Seal) |

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

ACKNOWLEDGMENT

STATE OF WEST VIRGINIA

COUNTY OF OHIO

On this the 7th day of August, 2008, before me, the undersigned authority, personally appeared Lee J. Glessner, who, being duly sworn according to law, deposes and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV-25362-0070

BOOK 788 PAGE 707

## EXHIBIT "A"

Attached to and made a part of that certain Oil and Gas Lease dated _Aug 7, 2008_, by and between Lee J. Glessner, whose address is Box 128, Valley Grove, West Virginia 26060 as Lessors, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of Ohio, State of West Virginia.

NOTWITHSTANDING the foregoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

*(4)Free Gas Clause*
*Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:*
if, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise. The rights granted herein

BOOK 788 PAGE 708

related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied.  At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

_(5)Hunting Clause_

It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day).  In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

Lee J. Glessner

PATRICIA A FAHEY
OHIO County 01:26:54 PM
Instrument No 1787430
Date Recorded 10/17/2008
Document Type DEEA
Book-Page    788-704
Recording Fee $6.00
Additional    $6.00

BOOK **790** PAGE **192**

**PAID-UP**

**OIL & GAS LEASE**

Lease No. 265432

5/08 - WV

This Lease, made this **11-19**, 2008, by and between GW Rentals, LLC, a West Virginia Corporation, whose address is 2084 National Road, Wheeling, West Virginia 26003, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

**DESCRIPTION.** The Leasehold is located in the District of Triadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: T4/4

and is bounded formerly or currently as follows:
On the North by lands of Randall Davis;
On the East by lands of Nancy Carter;
On the South by lands of Covenanter Church Road/Ridge Road;
On the West by lands of Leo J. Glessner;

including lands acquired from Leo J. Glessner by virtue of deed dated August 9, 1999, and recorded in Deed Book 714, at Page 234, and described for the purposes of this agreement as containing a total of 10.68 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (i) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (ii) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of Five (5) years from 12:08 A.M. **11-19-08** (effective date) to 11:59 P.M. **11-18-2013** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that this Lease has been extended beyond the primary term.

**EXTENSION OF PRIMARY TERM.** Lessee has the option to extend the primary term of this Lease for an additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

**NO AUTOMATIC TERMINATION OR FORFEITURE.**

**(A)** CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

**(a)** LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

**PAYMENTS TO LESSOR.** In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

**(A)** DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

**(B)** ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor on actual volume of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this Lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating

EXHIBIT
B

BOOK **790** PAGE **193**

liquid hydrocarbons from gas, other than condensate separated at the well, and (e) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessee may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) **DELAY IN MARKETING:** In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) **SHUT-IN:** In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) **DAMAGES:** Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) **MANNER OF PAYMENT:** Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) **CHANGE IN LAND OWNERSHIP:** Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) **TITLE:** If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) **LIENS:** Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) **CHARACTERIZATION OF PAYMENTS:** Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that the oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessee hereby agrees that such payments terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are fixed and that Lessor will not seek to cancel or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) **PAYMENT REDUCTIONS:** If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except the Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

**UNITIZATION AND POOLING.** Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or non-contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and condition of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each well well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on that latter as being determinative for the purposes of this paragraph.

**FACILITIES.** Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

**CONVERSION TO STORAGE.** Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessee shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the rent ceasing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

**TITLE AND INTERESTS.** Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

**LEASE DEVELOPMENT.** There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

**COVENANTS.** This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

**RIGHT OF FIRST REFUSAL.** If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the contributing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

**BOOK 790 PAGE 194**

conditions, if Lessor fails to notify Lessee within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to be in conformity with all laws, rules, regulations and orders and interpreted as such. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.                GW RENTALS, LLC

Witness _____          _____ (Seal)
                                            Guy W. Glessner, III, President
Witness _____          _____ (Seal)
Witness _____          _____ (Seal)
Witness _____          _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

CORPORATE ACKNOWLEDGMENT

STATE OF WEST VIRGINIA

COUNTY OF OHIO

On this the 19 day of Nov _____, 2008, before me, the undersigned authority, personally appeared Guy W. Glessner, III who acknowledged himself to be the President of GW Rentals, LLC and that he as such _____ being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _____ a _____ corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: June 11, 2009
Signature/Notary Public: Kathy A. Elliott
Name/Notary Public (print): Kathy A. Elliott

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

BOOK **790** PAGE **195**

## ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated ____ 11-19-08 ____
by and between GW Rentals, LLC, a West Virginia Corporation, whose address is 2084
National Road, Wheeling, West Virginia 26003, as Lessors, and Chesapeake Appalachia,
L.L.C., as Lessee, covering land in the District of Triadelphia, County of Ohio, State of
West Virginia.

**NOTWITHSTANDING** the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of
Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline
and access road locations, consent not to be unreasonably withheld, delayed or
conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against
and from any penalty or damage or charges imposed for any violation of any laws or
ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee,
and Lessee will at all times protect, indemnify and save and keep harmless the Lessor
against and from any and all loss, damage or expense, including any injury to any person
or property whomsoever or whatsoever arising out of or caused by any negligence of the
Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a
manner which would minimize any related soil erosion. Further, any related surface
reclamation shall be done in a manner which restores said land as nearly to original
contours as reasonably practical.

*(4)Free Gas Clause*
    *Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:*
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of
the surface of the leased premises and either all the oil and gas underlying the same, or an
undivided interest in the oil and gas underlying the same, or the express record title right
to receive free gas, then upon approval of Lessor's written request for free gas, and after
Lessor has obtained 100% written consent from all owners having the legal right to
receive revenue from a productive well on the leased premises, and Lessor's execution of
Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a
line to any one (1) producing gas well on the leased premises and take up to two hundred
thousand (200,000) cubic feet of gas during any single twelve (12) month period for
domestic use in one currently existing primary dwelling owned at all times by Lessor and
located within a one thousand (1,000') foot radius from said well on the leased premises;
subject, however to such well being capable of producing in commercial quantities and of
commercial quality suitable for domestic use; the existence and availability of a local
distribution company willing to administer, control, monitor, and service such free gas
usage to the specifications and requirements of Lessee; and subject further to the use,
maintenance, operation, production, limited deliverability, and right of shut-in and/or
plugging and abandonment by Lessee of its well(s), equipment and pipelines on the
leased premises. Lessor shall secure such gas by service line laid to and connected to
such well on said leased premises in accordance with all applicable laws, rules and
regulations, the point of connection to be designated by Lessee and Lessor shall assume
the entire risk and all expenses associated with securing and using such gas and agrees, to
the fullest extent of applicable law, to release and indemnify Lessee from and against any
and all claims or causes of action arising therefrom or relating thereto. If Lessor in any
year uses gas in excess of the quantity provided for herein, Lessor shall pay for all
overburn gas at the current established retail rate in the area or at the rate charged by the
local distribution company administering the free gas usage, but Lessee assumes no
obligation to furnish Lessor with gas in excess of the quantity provided herein. The
measurement and regulation of such gas shall be by meter regulators furnished by Lessor,
subject to Lessee's approval, and set at the tap on the well. Notwithstanding the
foregoing provisions, in the event the leased premises are made a part of a unit or pooled
with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

BOOK 7 9 0 PAGE 196

will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

*(5)Hunting Clause*
It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day). In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR IDENTIFICATION:

Gary W. Gießner III, President

PATRICIA A FINEY
OHIO County 02:15:06 PM
Instrument No 1806115
Date Recorded 12/15/2008
Document Type OG&L
Book-Page     790-192
Recording Fee $5.00
Additional   $6.00

192

BOOK **790** PAGE **210**

**PAID-UP**
**OIL & GAS LEASE**

5508 - WV

Lease No. 265450

This Lease, made this 19 day of Nov 2008, by and between GW Rentals, LLC, a West Virginia Corporation, whose address is PO Box 205 Valley Grove, WV 26060, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons constituents, in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seams, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use of install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injection of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

**DESCRIPTION.** The Leasehold is located in the District of Triadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: T4/2.2

and is bounded formerly or currently as follows:
On the North by lands of Glessner;
On the East by lands of Multiple Parcels of Land;
On the South by lands of Multiple Parcels of Land;
On the West by lands of Sinclair;

including lands acquired from Lou I. Glessner by virtue of deed dated August 9, 1999, and recorded in Deed Book 714, at Page 234, and described for the purposes of this agreement as containing a total of 26.646 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M. Nov 19 2008 (effective date) to 11:59 P.M. Nov 18 2013 (last day of primary term) and shall continue beyond the primary term to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

**EXTENSION OF PRIMARY TERM.** Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee without any other alteration of the Lease Term clause except as beyond the primary term.

**NO AUTOMATIC TERMINATION OR FORFEITURE.**
**(A) CONSTRUCTION OF LEASE:** The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining pipeline and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

**(B) LIMITATION OF FORFEITURE:** This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such response shall be deemed to satisfy this provision, and this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

**PAYMENTS TO LESSOR.** In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.
2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this Lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating



EXHIBIT
C

97

BOOK 790 PAGE 211

liquid hydrocarbons from gas, other than condensate separated at the well, and (e) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expense relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessor may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or deposit. Where the law date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change to the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may close either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessee recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessee hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessee further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other leasehold and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or part of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of each unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the same, the Lease, Lessee may, at its option, rely on this latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the one year ending Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease through the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease; the Lease's ratifications be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK 790 PAGE 212

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon such surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to be in conformity with all laws, rules, regulations and orders and interpreted as such. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

GW RENTALS, LLC

Witness _____  _____ (Seal)
Gary W. Glessner III, President

Witness _____  _____ (Seal)

Witness _____  _____ (Seal)

Witness _____  _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

CORPORATE ACKNOWLEDGMENT

STATE OF WEST VIRGINIA

COUNTY OF OHIO

On this 19 day of Nov, 2008, before me, the undersigned authority, personally appeared Gary W. Glessner, III who acknowledged himself to be the President of GW Rentals, LLC and that he as such Pres, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _____, a _____ corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: Aug 11, 2009

Signature/Notary Public: _____

Name/Notary Public (print): Kathy A. Elliott

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

BOOK 790 PAGE 213

**ADDENDUM**

Attached to and made a part of that certain Oil and Gas Lease dated Nov 19.08, by and between GW Rentals, LLC, a West Virginia Corporation, whose address is PO Box 205 Valley Grove, WV 26060 as Lessors, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of Ohio, State of West Virginia.

NOTWITHSTANDING the forgoing provisions hereof, it is understood and agreed:

**(1)Location Approval Clause**
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

**(2)Hold Harmless Clause**
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

**(3)Reclamation Clause**
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

**(4)Free Gas Clause**
**Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:**
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

BOOK 790 PAGE 214

will not be entitled to use wellhead gas, free or otherwise.  The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises.  Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas.  Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied.  At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

*(5)Hunting Clause*
It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day).  In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

Gary W. Gleasher/III, President

PATRICIA A FAHEY
Ohio County 02:20:05 PM
Instrument No 1800116
Date Recorded 12/15/2009
Document Type DEED
Book-Page        790-210
Recording Fee $5.00
Additional    $5.00

BOOK 788 PAGE 709

PAID-UP
OIL & GAS LEASE

3/08 - WV                                                                                    Lease No. 23X0515

This Lease, made this 4 day of August, 2008, by and between Leo J. Glessner, whose address is Box 128 Valley Grove, West Virginia 26060, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-void area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such nonexclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment. DESCRIPTION. The Leasehold is located in the District of Triadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: T4/2

and is bounded formerly or currently as follows:
    On the North by lands of Multiple Parcels of Land;
    On the East by lands of Multiple Parcels of Land;
    On the South by lands of GW Rentals, LLC;
    On the West by lands of Sinclair;

including lands acquired from Gary William Glessner by virtue of deed dated April 10, 1985, and recorded in Deed Book 624, at Page 709, and described for the purposes of this agreement as containing a total of 86.894 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of Seven (7) years from 12:00 A.M. August 4, 2008 (effective date) to 11:59 P.M. August 3, 2015 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of Five (5) years from the expiration of the primary term of this Lease, said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option to extend the Lease's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term referenced in the Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.
    (A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with the any approval process required for conducting such activities).
    (B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.
    PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:
    (A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.
    (B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
        1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.
        2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating




EXHIBIT
D

BOOK 788 PAGE 710

liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessor may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amounts so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessor shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or deposit. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessor shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessor receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not look to payments or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee may or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing is one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the land properly tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessor's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessee shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for so long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for the protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment thereof and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provision herein, including, but not limited to the presented payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessee, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK 788 PAGE 711

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered: provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to be in conformity with all laws, rules, regulations and orders and interpreted as such. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____    _____ (Seal)
                                      Lee J. Glessner

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

## ACKNOWLEDGMENT

STATE OF WEST VIRGINIA

COUNTY OF OHIO

On this the 7th day of August, 2008, before me, the undersigned authority, personally appeared Lee J. Glessner, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: April 11, 1809
Signature/Notary Public: _____
Name/Notary Public (print): Kathy M. Elliott

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

BOOK 788 PAGE 712

## EXHIBIT "A"

Attached to and made a part of that certain Oil and Gas Lease dated August 4, 2008, by and between Lee J. Glessner, whose address is Box 128, Valley Grove, West Virginia 26060 as Lessors, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of Ohio, State of West Virginia.

**NOTWITHSTANDING** the forgoing provisions hereof, it is understood and agreed:

**(1)Location Approval Clause**
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

**(2)Hold Harmless Clause**
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

**(3)Reclamation Clause**
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

**(4)Free Gas Clause**
    **Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:**
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises.  Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto.  If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein.  The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well.  Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder will not be entitled to use wellhead gas, free or otherwise.  The rights granted herein

BOOK 788 PAGE 713

related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

**(5)Hunting Clause**

It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day). In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

Lee J. Glessner

PATRICIA A FAREY
OHIO County 01:28:45 PM
Instrument No 1789432
Date Recorded 10/17/2008
Document Type OGGL
Book-Page        788-709
Recording Fee $5.00
Additional    $5.00



### PAID-UP
### OIL & GAS LEASE

BOOK **7 8 9** PAGE **9 1**

Lease No. 256013

08/08 - WV

This Lease, made this ___31___ day of ___Aug___, 2008, by and between Windmill Truckers Center, Inc, a West Virginia Corporation, whose address is 2084 National Road, Wheeling, West Virginia 26003, hereinafter collectively called "Lessor," and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-6070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the District of Triadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number:T9/36.7

and is bounded formerly or currently as follows:
On the North by lands of Windmill Truckers Center, Inc.;
On the East by lands of Multiple Parcels;
On the South by lands of Multiple Parcels;
On the West by lands of Belco Oil Co, Inc.;
including lands acquired from Suder, Inc by virtue of deed dated January 7, 2000, and recorded in Deed Book 717, at Page 655, and described for the purposes of this agreement as containing a total of 16 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of Five(2) years from 12:00 A.M. ___8/1-08___ (effective date) to 11:59 P.M. ___7/31-2013___ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/utilized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option at Lessee's sole discretion and may be invoked by Lessee where one other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, flush, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OR FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

I. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used



BOOK 789 PAGE 92

In this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessor may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market production's gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or merchantable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessee will not seek to amend or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessee owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor a proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for so long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the rental Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessor shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK 789 PAGE 93

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon such surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____    _____ (Seal)
                                                                     Gary W. Glessner

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

ACKNOWLEDGMENT

STATE OF _____                          )
                                                                                      ) SS:
COUNTY OF _____                        )

On this the ____ day of _____, 2008, before me, the undersigned authority, personally appeared _____, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

CORPORATE ACKNOWLEDGMENT

STATE OF  WeST Virginia                          )
                                                                 ) SS:
COUNTY OF  Ohio                                      )

On this the 21 day of Aug_____, 2008, before me, the undersigned authority, personally appeared Gary W. Glessner who acknowledged himself to be the Acting President and Vice President of Windmill Truckers Center, Inc. and that he as such Acting President and Vice President being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Windmill Truckers Center, Inc. a West Virginia corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                                                Official Seal
My Commission Expires: Aug. 14, 2018                Notary Public, State of West Virginia
Signature/Notary Public: _____            Keith J. Balzenchak
Name/Notary Public (print): Keith J. Balzenchak      1100 9th Street
                                                                                Vienna, WV 26105
                                                                                My commission expires August 14, 2018

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

BOOK 789 PAGE 94

### Addendum

Attached to and made a part of that certain Oil and Gas Lease dated 8-31-08 by and between Windmill Truckers Center, Inc., A West Virginia Corporation, whose address is 2084 National Road, Wheeling, West Virginia 26003 as Lessors, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of Ohio, State of West Virginia.

**NOTWITHSTANDING** the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

*(4)Free Gas Clause*
    *Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:*
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

BOOK 789 PAGE 95

will not be entitled to use wellhead gas, free or otherwise.  The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises.  Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied.  At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

_(5)Hunting Clause_
It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day).  In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

**SIGNED FOR IDENTIFICATION:**

Gary W. Glessner, Acting President and Vice President

PATRICIA A FAHEY
OHIO County 03:50:51 PM
Instrument No 1789442
Date Recorded 10/24/2008
Document Type DEED
Book-Page     789-91
Recording Fee $5.00
Additional    $5.00

BOOK 790 PAGE 202

PAID-UP
OIL & GAS LEASE

Lease No. 245431

5/08 - WV

This Lease, made this 3 day of August 2008, by and between Windmill Truckers Center, Inc., a West Virginia Corporation, whose address is 2084 National Road, Wheeling, West Virginia 26003, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the District of Philadelphia, in the County of Ohio, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: 79/4

and is bounded formerly or currently as follows:
On the North by lands of Sinclair;
On the East by lands of Glenn;
On the South by lands of Multiple Parcels of Land;
On the West by lands of Kidner;

including lands acquired from Sudar, Inc. by virtue of deed dated January 7, 2080, and recorded in Deed Book 717, at Page 655, and described for the purposes of this agreement as containing a total of 140 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M. Nov 19, 2008 (effective date) to 11:59 P.M. Nov 19, 2013 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a unit declared by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operation on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease, said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee when and no other alternatives for Lease Term clauses extends the Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain the Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lease shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating

EXHIBIT
F

202

BOOK 790 PAGE 203

liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting such oil or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount sold and/or the product, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessor's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessee may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D)  SHUT-IN:  In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E)  DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F)  MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessee, at Lessee's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in of time. Payment may be tendered by cash or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G)  CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H)  TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I)  LIENS:  Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J)  CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that each payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K)  PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the royalty (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessee's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessee grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to the Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with an implied covenant.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or order, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this Lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK  790 PAGE  205

## ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated _Nov 19, 2008_
by and between Windmill Truckers, Inc., a West Virginia Corporation, whose address is
2084 National Road, Wheeling, West Virginia 26003 as Lessors, and Chesapeake
Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of
Ohio, State of West Virginia.

NOTWITHSTANDING the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of
Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline
and access road locations, consent not to be unreasonably withheld, delayed or
conditioned by Lessor.
*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against
and from any penalty or damage or charges imposed for any violation of any laws or
ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee,
and Lessee will at all times protect, indemnify and save and keep harmless the Lessor
against and from any and all loss, damage or expense, including any injury to any person
or property whomsoever or whatsoever arising out of or caused by any negligence of the
Lessee or those holding under Lessee.
*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a
manner which would minimize any related soil erosion. Further, any related surface
reclamation shall be done in a manner which restores said land as nearly to original
contours as reasonably practical.
*(4)Free Gas Clause*
*Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:*
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of
the surface of the leased premises and either all the oil and gas underlying the same, or an
undivided interest in the oil and gas underlying the same, or the express record title right
to receive free gas, than upon approval of Lessor's written request for free gas, and after
Lessor has obtained 100% written consent from all owners having the legal right to
receive revenue from a productive well on the leased premises, and Lessor's execution of
Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a
line to any one (1) producing gas well on the leased premises and take up to two hundred
thousand (200,000) cubic feet of gas during any single twelve (12) month period for
domestic use in one currently existing primary dwelling owned at all times by Lessor and
located within a one thousand (1,000') foot radius from said well on the leased premises;
subject, however to such well being capable of producing in commercial quantities and of
commercial quality suitable for domestic use; the existence and availability of a local
distribution company willing to administer, control, monitor, and service such free gas
usage to the specifications and requirements of Lessee; and subject further to the use,
maintenance, operation, production, limited deliverability, and right of shut-in and/or
plugging and abandonment by Lessee of its well(s), equipment and pipelines on the
leased premises.  Lessor shall secure such gas by service line laid to and connected to
such well on said leased premises in accordance with all applicable laws, rules and
regulations, the point of connection to be designated by Lessee and Lessor shall assume
the entire risk and all expenses associated with securing and using such gas and agrees, to
the fullest extent of applicable law, to release and indemnify Lessee from and against any
and all claims or causes of action arising therefrom or relating thereto. If Lessor in any
year uses gas in excess of the quantity provided for herein, Lessor shall pay for all
overburn gas at the current established retail rate in the area or at the rate charged by the
local distribution company administering the free gas usage, but Lessee assumes no
obligation to furnish Lessor with gas in excess of the quantity provided herein.  The
measurement and regulation of such gas shall be by meter regulators furnished by Lessor,
subject to Lessee's approval, and set at the tap on the well.  Notwithstanding the
foregoing provisions, in the event the leased premises are made a part of a unit or pooled
with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

BOOK 790 PAGE 206

will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied.  At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

*(5)Hunting Clause*

It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day).  In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

Gary W. Gleeger III, Vice President of Windmill Trucking, Inc

PATRICIA A FAHEY
OHIO County 02:13:26 PM
Instrument No 1800116
Date Recorded 12/15/2008
Document Type DEED
Book-Page    790-202
Recording Fee $5.00
Additional    $5.00

BOOK **673** PAGE**538**

**PAID-UP**

**OIL & GAS LEASE**

Lease No. **264256**

04/08 - WV

This Lease, made this _____1_____ day of ____Sept____, 2008, by and between Norma Tobaugh, wife, Dawnise Tobaugh, daughter, Clarence W. Tubaugh, son, and Gary W. Glessner, grandson, whose address is 2084 National Road, Wheeling, WV 26003, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

**DESCRIPTION.** The Leasehold is located in the District of Sand Hill, in the County of Marshall, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: 12-2/8

and is bounded formerly or currently as follows:

On the North by lands of Betty I. Baird;
On the East by lands of Daniel William McFarlan;
On the South by lands of Carl W. Goddard, Jr;
On the West by lands of Richard S. Reinzke;

including lands acquired from Albert H. Schaper by virtue of deed dated April 10, 1966, and recorded in Deed Book 183, at Page 511, and described for the purposes of this agreement as containing a total of 215 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of Five (5) years from 12:00 A.M. 9-1-08 (effective date) to 11:59 P.M. 9-1-2013 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

~~EXTENSION OF PRIMARY TERM.~~ ~~Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease and extends to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends the Lease beyond the primary term.~~

**NO AUTOMATIC TERMINATION OR FORFEITURE.**

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any related costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision. this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

**PAYMENTS TO LESSOR.** In addition to the bonus paid by Lessee for the execution hereof, Lessee consents to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used



EXHIBIT

G1

BK# 673 PAGE 539

in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessor may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D)  SHUT-IN:  In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E)  DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F)  MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address.  Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch.  Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G)  CHANGES IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H)  TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I)  LIENS:  Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J)  CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek in round or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/old and gas owner.

(K)  PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder, shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing is one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each well well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and the expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessor shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

BOOK 673 PAGE 540

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon such surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____        Norma Tubaugh _____ (Seal)
                                            Norma Tubaugh
Witness _____        _____ (Seal)
                                            Dawalen Tubaugh
Witness _____        _____ (Seal)
                                            Clarence W. Tubaugh
Witness _____        _____ (Seal)
                                            Gary W. Glessner

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

ACKNOWLEDGMENT

STATE OF WEST VIRGINIA                    )
                                         ) SS:
COUNTY OF MARSHALL                       )

On this the ____ day of _____, 2008, before me, the undersigned authority, personally appeared Norma Tubaugh, wife, Dawalen Tubaugh, daughter, Clarence W. Tubaugh, son, and Gary W. Glessner, grandson, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

CORPORATE ACKNOWLEDGMENT

STATE OF _____          )
                                         ) SS:
COUNTY OF _____         )

On this the ____ day of _____, 2008, before me, the undersigned authority, personally appeared _____ who acknowledged himself to be the _____ of _____, and that he as such being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as _____ a _____ corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

BOOK **673** PAGE**541**

## ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated ___9-1-2008___, by and between Norma Tubaugh, wife, Dawnisa Tubaugh, daughter, Clarence Tubaugh, son, and Gary W. Glessner, grandson, whose address is 2084 National Road, Wheeling, West Virginia 26003 as Lessors, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of Sand Hill, County of Marshall, State of West Virginia.

NOTWITHSTANDING the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

*(4)Free Gas Clause*
*Annual Payment of 200 mcf X $ said in Lieu of Free Gas Clause:*
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein. The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well. Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

BOOK **673** PAGE 542

will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

**(5)***Hunting Clause*
It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day). In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

**(6)***Agency Clause or Payment Directive*
All monies coming due and payable under the terms of this lease shall be made payable to Norma Tubaugh, 2084 National Road, Wheeling, WV 26003, as Agent.
   Clarence Tubaugh, 2084 National Road, Wheeling, WV 26003, as Agent.
   Gary W. Glessner, 2084 National Road, Wheeling, WV 26003, as Agent.

JAN PEST
MARSHALL County 12:39:05 PM
Instrument No 1259804
Date Recorded 10/24/2008
Document Type OGL
Book-Pass      673-535
Recording Fee $5.00
Additional    $5.00

**SIGNED FOR IDENTIFICATION:**

*Norma Scobaugh*
Norma Tubaugh

*Jennifer Tubaugh*
Dawnica Tubaugh

*Clarence W. Tubg*
Clarence Tubaugh

Gary W. Glessner

STATE OF WEST VIRGINIA, MARSHALL COUNTY, SCT.:

I, JAN PEST, Clerk of the County Commission of said County, do hereby certify that the annexed writing, bearing date on the _____ day of _September_ _2008_, was presented for and by me, admitted to record in my office upon the above certificate as to the parties therein named this _____ day of _October_ _2008_ at _12:39_ o'clock P.M.

                                        TESTE:_____Jan Pest_____Clerk.

OPS CM 2-06


EXHIBIT H

**PAID-UP**

**OIL & GAS LEASE**

Lease No. _____

08/08 - WV

This Lease, made this _____ day of _____, 2008, by and between Robert B. Elliott and Kathy A. Elliott, husband and wife, whose address is RR1 Box 131A-2, Valley Grove, West Virginia 26060, hereinafter collectively called "Lessor", and **CHESAPEAKE APPALACHIA, L.L.C.**, an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

**LEASING CLAUSE.** Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

**DESCRIPTION.** The Leasehold is located in the District of Triadelphia in the County of Ohio in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: T4/4.2

and is bounded formerly or currently as follows:
On the North by lands of GW Rentals;
On the East by lands of Multiple Parcels of Land;
On the South by lands of Multiple Parcels of Land;
On the West by lands of GW Rentals;

including lands acquired from Gary W. Glessner and Melissa S. Glessner, his wife, and Leo J. Glessner, by virtue of deed dated February 27, 2002 and recorded in Deed Book 739, at Page 674, and described for the purposes of this agreement as containing a total of 3.712 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

**LEASE TERM.** This Lease shall remain in force for a primary term of _five (5)_ years from 12:00 A.M. _____ (effective date) to 11:59 P.M. _____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessor for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

**EXTENSION OF PRIMARY TERM.** ~~Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease, said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.~~

**NO AUTOMATIC TERMINATION OR FORFEITURE.**
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

**PAYMENTS TO LESSOR.** In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of _five dollars ($5.00)_ per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.
2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating



liquid hydrocarbons from gas, other than condensate separated at the well, and (o) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities.  Prior to payment of royalty, Lessee may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D)  SHUT-IN:  In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as a Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and  this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E)  DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F)  MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address.  Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch.  Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G)  CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H)  TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I)  LIENS:  Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J)  CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoiced.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessee recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/lessee and gas owner.

(K)  PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.  Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessee agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessee's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessee shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessor shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

## ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated _____,
by and between Robert B. Elliott and Kathy A. Elliott, husband and wife, whose address
is RR1 Box 131A-2, Valley Grove, West Virginia 26060 as Lessors, and Chesapeake
Appalachia, L.L.C., as Lessee, covering land in the District of Triadelphia, County of
Ohio, State of West Virginia.

**NOTWITHSTANDING** the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of
Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline
and access road locations, consent not to be unreasonably withheld, delayed or
conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against
and from any penalty or damage or charges imposed for any violation of any laws or
ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee,
and Lessee will at all times protect, indemnify and save and keep harmless the Lessor
against and from any and all loss, damage or expense, including any injury to any person
or property whomsoever or whatsoever arising out of or caused by any negligence of the
Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a
manner which would minimize any related soil erosion. Further, any related surface
reclamation shall be done in a manner which restores said land as nearly to original
contours as reasonably practical.

*(4)Free Gas Clause*
   *Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause;*
If, and only if, Lessor is entitled to receive gas, whether by virtue of the ownership of
the surface of the leased premises and either all the oil and gas underlying the same, or an
undivided interest in the oil and gas underlying the same, or the express record title right
to receive free gas, then upon approval of Lessor's written request for free gas, and after
Lessee has obtained 100% written consent from all owners  having the legal right to
receive revenue from a productive well on the leased premises, and Lessor's execution of
Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a
line to any one (1) producing gas well on the leased premises and take up to two hundred
thousand (200,000) cubic feet of gas during any single twelve (12) month period for
domestic use in one currently existing primary dwelling owned at all times by Lessor and
located within a one thousand (1,000') foot radius from said well on the leased premises;
subject, however to such well being capable of producing in commercial quantities and of
commercial quality suitable for domestic use; the existence and availability of a local
distribution company willing to administer, control, monitor, and service such free gas
usage to the specifications and requirements of Lessee; and subject further to the use,
maintenance, operation, production, limited deliverability, and right of shut-in and/or
plugging and abandonment by Lessee of its well(s), equipment and pipelines on the
leased premises.  Lessor shall secure such gas by service line laid to and connected to
such well on said leased premises in accordance with all applicable laws, rules and
regulations, the point of connection to be designated by Lessee and Lessor shall assume
the entire risk and all expenses associated with securing and using such gas and agrees, to
the fullest extent of applicable law, to release and indemnify Lessee from and against any
and all claims or causes of action arising therefrom or relating thereto.  If Lessor in any
year uses gas in excess of the quantity provided for herein, Lessor shall pay for all
overburn gas at the current established retail rate in the area or at the rate charged by the
local distribution company administering the free gas usage, but Lessee assumes no
obligation to furnish Lessor with gas in excess of the quantity provided herein.  The
measurement and regulation of such gas shall be by meter regulators furnished by Lessor,
subject to Lessee's approval, and set at the tap on the well.  Notwithstanding the
foregoing provisions, in the event the leased premises are made a part of a unit or pooled
with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

### (5) Hunting Clause

It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day). In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

_____
Robert B. Elliott

_____
Kathy A. Elliott

CHESAPEAKE APPALACHIA, L.L.C.

# ORDER OF PAYMENT

Date: _____

Subject to approval of the agreement associated herewith ("Agreement") and title confirmation by Chesapeake Appalachia, L.L.C. ("Chesapeake"), Chesapeake will make payment as indicated herein by check within 90 days of its receipt of the original of this Order of Payment and the Agreement. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely. The copy of this Order of Payment is to be retained by payee. No default for non-payment may be claimed by payee during said 90-day period.

If payee owns more or less than the net interest defined herein, Chesapeake may, without immediate notice to Lessor, increase or reduce the consideration payable hereunder proportionate to actual interest owned by payee.

Payee represents he/she has a full understanding of the risks involved in leasing property for oil and gas development and that payee has read and understands the terms and provisions of the Agreement. Payee agrees this is an arm's length transaction entered into by payee as a result of his/her own free act and will and Chesapeake or anyone acting on its behalf has made no representations of value or exerted any duress or coercion. Payee agrees that payment made hereunder is final and that payee will not seek to amend or modify the payment, or seek additional consideration based upon any differing terms which Chesapeake has or will negotiate with any other lessor/oil and gas owner. Non-acceptance by payee of timely payment shall not serve to void the Agreement.

Pay to     Robert B. Elliott and Kathy A. Elliott

|  |  | in the amount |
|---|---|---|
| of | Three Thousand Seven Hundred Twelve and 00/100------------------------------------ dollars ( $ | $3,712.00 ) |
| Address | RR1 Box 131A-2 | |
|  | Valley Grove, WV 26060 | |

| PAYEE SOCIAL SECURITY NO | STATE  West Virginia | COUNTY/PARISH  Ohio | TOWNSHIP/DISTRICT/TOWN OF  Triadelphia |
|---|---|---|---|
| PROSPECT/PROJECT NAME  Ohio County, West Virginia | | | WELL NUMBER |
| LEASE NUMBER | [X] New        [ ] Renewal | PIPELINE NUMBER OR DESCRIPTION | |

This payment is for a 5 year Oil and Gas Lease

dated _____ , 2008     which covers property described as follows: _____

Tax Map T-4 Parcel 4.2 Containing 3.712 Acres

Completed by: _____

Landowner's signature _____

Approved by: _____

| | DATE PAID | PAID BY |
|---|---|---|
| Forward to: | | |
| LAND DEPARTMENT | FOR | |
| CHESAPEAKE APPALACHIA, L.L.C. | INTERNAL   AMOUNT | CHECK NUMBER |
| PO BOX 6070 | USE ONLY | |
| CHARLESTON, WV 25362-0070 | NOTE | |

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

 ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

 ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

 SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

 SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

 FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

 SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

 COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

| | |
|---|---|
| Witness _____ | _____ (Seal) |
| | Robert B. Elliott |
| Witness _____ | _____ (Seal) |
| | Kathy A. Elliott |
| Witness _____ | _____ (Seal) |
| Witness _____ | _____ (Seal) |

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

## ACKNOWLEDGMENT

STATE OF WEST VIRGINIA

COUNTY OF OHIO

On this the __ day of Dec _____, 2008, before me, the undersigned authority, personally appeared Robert B. Elliott and Kathy A. Elliott, husband and wife, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: Aug 14, 2018

Signature/Notary Public: _____

Name/Notary Public (print): Keith J Balaschak

**Official Seal**
Notary Public, State of West Virginia
Keith J. Balaschak
1100 9th Street
Vienna, WV 26105
My commission expires August 14, 2018

I WITNESSED BOTH OWNERS SIGNATURES ON DEC 19, 2008

MONIES TO BE PAID WITHIN 90 (NINETY) DAYS

EXHIBIT
I

**PAID-UP**
**OIL & GAS LEASE**

Lease No. _____

08/08 - WV

This Lease, made this _____ day of _____, 2008, by and between Robert B. Elliott, a married man dealing in his sole and separate property, whose address is RR1 Box 131 A-2, Valley Grove, West Virginia 26060, hereinafter collectively called "Lessor", and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mine-out area, coal seam, and all communicating zones, and their liquid gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the District of Sandhill in the County of Marshall, in the State of West Virginia, and described as follows:

Property Tax Parcel Identification Number: 2/10

and is bounded formerly or currently as follows:
On the North by lands of Litman
On the East by lands of Reineke
On the South by lands of Multiple Parcels of Land;
On the West by lands of Gira

including lands acquired from by virtue of will dated October 18, 1985, and recorded in Will Book 58, at Page 107, and described for the purposes of this agreement as containing a total of 166.26 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. _____ (effective date) to 11:59 P.M. _____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.
(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:
(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.
(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:
1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.
2. GAS: To pay Lessor on actual volumes of gas sold from said land, one-eighth of the net amount realized by Lessee, computed at the wellhead. As used in this lease, the term "net amount realized by Lessee, computed at the wellhead" shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale As used in this Lease, the term "post-production costs" shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating

liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities. Prior to payment of royalty, Lessee may be required to execute a Division Order certifying Lessor's interest in production. Lessee may pay all taxes and fees levied upon the oil and gas as produced, including, without limitation, severance taxes and privilege and surveillance fees, and deduct a proportionate share of the amount so paid from any monies payable to Lessor hereunder. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents, therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents, is interrupted and not marketed for a period of twelve (12) months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may, at its option, pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon of any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this agreement.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in any well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease; the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts of God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this lease or any continuation thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and

# ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated _____, by and between Robert B. Elliott, a married man dealing in his sole and separate property, whose address is RR1 Box 131 A-2, Valley Grove, West Virginia 26060 as Lessor, and Chesapeake Appalachia, L.L.C., as Lessee, covering land in the District of, County of, State of West Virginia.

**NOTWITHSTANDING** the forgoing provisions hereof, it is understood and agreed:

*(1)Location Approval Clause*
Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

*(2)Hold Harmless Clause*
Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

*(3)Reclamation Clause*
Lessee shall construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly to original contours as reasonably practical.

*(4)Free Gas Clause*
   *Annual Payment of 200 mcf X $ sold in Lieu of Free Gas Clause:*
If, and only if, Lessor is entitled to receive free gas, whether by virtue of the ownership of the surface of the leased premises and either all the oil and gas underlying the same, or an undivided interest in the oil and gas underlying the same, or the express record title right to receive free gas, then upon approval of Lessor's written request for free gas, and after Lessor has obtained 100% written consent from all owners  having the legal right to receive revenue from a productive well on the leased premises, and Lessor's execution of Lessee's Delivery of Free Gas and Overburn Gas Agreement, one (1) Lessor may lay a line to any one (1) producing gas well on the leased premises and take up to two hundred thousand (200,000) cubic feet of gas during any single twelve (12) month period for domestic use in one currently existing primary dwelling owned at all times by Lessor and located within a one thousand (1,000') foot radius from said well on the leased premises; subject, however to such well being capable of producing in commercial quantities and of commercial quality suitable for domestic use; the existence and availability of a local distribution company willing to administer, control, monitor, and service such free gas usage to the specifications and requirements of Lessee; and subject further to the use, maintenance, operation, production, limited deliverability, and right of shut-in and/or plugging and abandonment by Lessee of its well(s), equipment and pipelines on the leased premises. Lessor shall secure such gas by service line laid to and connected to such well on said leased premises in accordance with all applicable laws, rules and regulations, the point of connection to be designated by Lessee and Lessor shall assume the entire risk and all expenses associated with securing and using such gas and agrees, to the fullest extent of applicable law, to release and indemnify Lessee from and against any and all claims or causes of action arising therefrom or relating thereto. If Lessor in any year uses gas in excess of the quantity provided for herein, Lessor shall pay for all overburn gas at the current established retail rate in the area or at the rate charged by the local distribution company administering the free gas usage, but Lessee assumes no obligation to furnish Lessor with gas in excess of the quantity provided herein.  The measurement and regulation of such gas shall be by meter regulators furnished by Lessor, subject to Lessee's approval, and set at the tap on the well.  Notwithstanding the foregoing provisions, in the event the leased premises are made a part of a unit or pooled with other acreage and the well(s) has been drilled on another lease, the Lessor hereunder

will not be entitled to use wellhead gas, free or otherwise. The rights granted herein related to free gas are not assignable or transferable to a party not currently owning an interest in the leasehold premises. Notwithstanding the foregoing, the specific terms and conditions of free gas use shall be governed and controlled by the Agreement for Delivery of Free Gas and Overburn Gas. Lessee shall be fully relieved of any further obligation to provide free gas or alternative payment to Lessor if any of the conditions provided hereinabove are not satisfied. At the time application is made for free gas, Lessee shall have the option to make an annual cash payment to the qualified applicant(s) equal to 200,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production in lieu of providing free gas and said sum shall thereafter permanently discharge Lessee's obligation under this lease to provide gas free of cost to Lessor, his successors, heirs and assigns.

### (5)Hunting Clause

It is understood and agreed that the Lessee will not commence drilling operations 30 days prior to deer hunting season (a 2 week period beginning the first Monday following Thanksgiving Day). In the event Lessee is conducting drilling operations 30 days prior to hunting season, Lessee will be permitted to continue operations.

SIGNED FOR INDENTIFICATION:

Robert B. Elliott

conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

REFERENCE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____        _____ (Seal)
                                            Robert B. Elliott

Witness _____        _____ (Seal)

Witness _____        _____ (Seal)

Witness _____        _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P. O. Box 6070, Charleston, West Virginia 25362-0070.

## ACKNOWLEDGMENT

STATE OF _West Virginia_ )
                          ) SS:
COUNTY OF _Ohio_          )

On this the _17_ day of _Dec._ , 2008, before me, the undersigned authority, personally appeared Robert B. Elliott, a married man dealing in his sole and separate property, who, being duly sworn according to law, depose and say that they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires _Aug 14, 2018_

Signature/Notary Public _Keith Belaschak_

Name/Notary Public (print) _Keith J Belaschak_

**Official Seal**
Notary Public, State of West Virginia
Keith J. Belaschak
1100 9th Street
Vienna, WV 26105
My commission expires August 14, 2018

1 405 935 8387

I WITNESSED OWNERS SIGNATURE ON DEC. 17 2008

Inumiss TO REFUND WITHIN 90 (NINETY) DAYS

Keith J B Belaschak.

Jay Reynolds

724 - 913. 5059

CHESAPEAKE APPALACHIA, L.L.C.

# ORDER OF PAYMENT

Date: _____

Subject to approval of the agreement associated herewith ("Agreement") and title confirmation by Chesapeake Appalachia, L.L.C. ("Chesapeake"), Chesapeake will make payment as indicated herein by check within 90 days of its receipt of the original of this Order of Payment and the Agreement. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely. The copy of this Order of Payment is to be retained by payee. No default for non-payment may be claimed by payee during said 90-day period.

If payee owns more or less than the net interest defined herein, Chesapeake may, without immediate notice to Lessor, increase or reduce the consideration payable hereunder proportionate to actual interest owned by payee.

Payee represents he/she has a full understanding of the risks involved in leasing property for oil and gas development and that payee has read and understands the terms and provisions of the Agreement. Payee agrees this is an arm's length transaction entered into by payee as a result of his/her own free act and will and Chesapeake or anyone acting on its behalf has made no representations of value or exerted any duress or coercion. Payee agrees that payment made hereunder is final and that payee will not seek to amend or modify the payment, or seek additional consideration based upon any differing terms which Chesapeake has or will negotiate with any other lessor/oil and gas owner. Non-acceptance by payee of timely payment shall not serve to void the Agreement.

Pay to  Robert B. Elliott _____

in the amount

of  One Hundred Sixty Six Thousand Two Hundred Sixty and 00/100———— dollars ( $  $166,260.00  )

Address  RR1 Box 131 A-2

Valley Grove, WV 26060

| PAYEE SOCIAL SECURITY NO | STATE  West Virginia | COUNTY/PARISH  Marshall | TOWNSHIP/DISTRICT/TOWN OF  Sandhill |
| --- | --- | --- | --- |
| PROSPECT/PROJECT NAME | Ohio County, West Virginia | | AFE/MARKER |
| LEASE NUMBER | [X] New | [ ] Renewal | PIPELINE NUMBER OR DESCRIPTION |

This payment is for  a 5 year Oil and Gas Lease _____

dated _____, 2008 ____, which covers property described as follows: _____

Tax Map 2 Parcel 10 Containing 166.26 Acres _____

Completed by: _____

Landowner's signature: _____R. A. Elliott_____

Approved by: _____

Forward to:
LAND DEPARTMENT
CHESAPEAKE APPALACHIA, L.L.C.
PO BOX 6070
CHARLESTON, WV 25362-0070

| | DATE PAID | PAID BY |
| --- | --- | --- |
| **FOR INTERNAL USE ONLY** | AMOUNT | CHECK NUMBER |
| | NOTE | |



1219 Chapline Street
Wheeling, West Virginia 26003
T: (304) 233-3100 • F: (304) 233-0201
www.baileywyant.com

500 Virginia Street East, Suite 600
Charleston, WV 26337
T: (304) 345-4222 • F: (304) 343-3133

Mark A. Kepple, Esq.
Email: mkepple@baileywyant.com

May 16, 2014

Joe Tarantelli, Esq.
Senior Attorney
Chesapeake Energy Corporation
P.O. Box 18496
Oklahoma City, OK 73154-049

**VIA U.S. Mail and email to: joe.tarantelli@chk.com**

Legal Department
Chesapeake Appalachia, L.L.C.
900 Pennsylvania Avenue
P.O. Box 6070
Charleston, WV 25362-0070

Re:  West Virginia – Marcellus Shale
Gary W. Glessner, Lee J. Glessner Tax Parcel T9/5 containing 78.519 – lease # 256014
GW Rentals, LLC – Tax Map #T4/4 containing 10.68 acres – lease # 265432
GW Rentals, LLC – Tax Map # T4/2.2 containing 26.646 acres – lease # 265430
Lee J. Glessner – Tax Map T4/2 containing 86.894 acres – lease # 256015
Windmill Truckers, Inc. – Tax Map # T9/36.7 containing 16 acres – lease # 256013
Windmill Truckers, Inc. – Tax Map # T9/4 – 140 acres – lease # 265431
Glessner et al. – Tax Map 12-2/5 – 215 acres – lease # 264256

Dear Mr. Tarantelli:

I hope this letter finds you well.  Please direct the following to the appropriate decision-maker at Chesapeake.  I write regarding Chesapeake's failure to abide by the terms of several lease agreements.

On December 14, 2011 Appalachia Midstream Services, L.L.C.[1] (hereinafter AMS) entered into a "Compression Facilities Lease Agreement" with Windmill Truckers Center, Inc.  The lease contains the following term regarding Taxes:

---

[1] It is my understanding that Chesapeake Midstream Partners L.P. is a wholly owned subsidiary of Chesapeake Energy Corporation and that it or another subsidiary of CHK now owns Appalachia Midstream Services, L.L.C. Please confirm my understanding is correct.

EXHIBIT
J

May 16, 2014

**Taxes**

LESSEE shall pay all property taxes, ad valorum taxes, special assessments, and any other charge, cost, or fee levied by state or local government authority against the Leased Premises as such shall first become due.

The taxes have not been paid timely.  On February 3, 2014, Windmill Truckers (Lessor) wrote to AMS advising of breach of the lease agreement and requested that it be cured.

**WINDMILL TRUCKERS CENTER, INC.**
**2084 NATIONAL ROAD**
**WHEELING, WV 26003**
**304-243-9071**

February 3, 2014

Appalachia Midstream Services, LLC
6100 N. Western Avenue
Oklahoma City, OK 73118-1044

Re: Lease with Windmill Truckers Center

Dear Appalachia Midstream Services:

For the past three (3) years your company has been issuing our company.  You have been issuing our company.  Your company did sale of real estate.  Your company did property as indicated ......... information along to ...... of your 1099s? ....... 1099 should rent.

Also, please note that your company is also responsible for all real estate taxes associated with the 27.53 acres that you lease.  Those real estate taxes are billed from the Ohio County Sheriff's office. Please call them at 304-234-3688.

Sincerely,

Gary W. Glessner, CPA

V-President, Windmill Truckers Center, Inc

Also, please note that your company is associated with the 27.53 acres that you from the Ohio County Sheriff's office. Pl

Sincerely,

Gary W. Glessner, CPA
V-President, Windmill Truckers Center, Inc.

According to the Assessor of Ohio County, West Virginia these taxes remain unpaid and are due and owing.  Windmill's previous attempts to handle this by telephone have been unsuccessful.  Please be advised that I view this as a default and breach of this lease.  Please immediately pay the real estate taxes and provide me with proof of payment within 7 business days or I will be forced to file an ejectment and trespass complaint to remove AMS/CHK from the subject property.  It is extremely dangerous to subject this valuable property to the prospect of a sheriff's sale.  Thus, I request you elevate this issue to the highest level so that it may be immediately resolved.

Chesapeake is also in violation of several gas leases.  My clients own an interest in approximately 570 acres in Ohio and Marshall County, West Virginia.  The vast majority of this property



May 16, 2014

is in very close proximity to the compressor station. This acreage was leased in 2008. The leases were for a five year term. These leases are subject to an Assignment and conveyance to Statoilhydro USA Onshore transferring 32.5% of Chesapeake's interest.

I write in an effort to avoid disruptive litigation and to salvage any leasehold relationships that may exist between Chesapeake Appalachia, LLC (hereinafter Chesapeake) and Statoil and the "Lessors" above.

The crux of this issue is that Chesapeake failed to negotiate leases that contain terms permitting their interests to extend into a second five year term. The leases generally were in force from August 2008 to August 2013. The clause permitting "Extension of Primary Term" was lined out reflecting the fact that the parties to this lease did not make an agreement as to the consideration to be paid for a second and final five (5) year lease term. All of the leases contain this agreed upon modification to the form lease.

For example, the 78.519 parcel lease, reads as follows[2]:

> specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.
> ~~EXTENSION OF PRIMARY TERM.~~ Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this lease if on or before the expiration date of the primary term of this Lease. Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.
> NO AUTOMATIC TERMINATION OR FORFEITURE.
> (A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration

Also, the 86.894 parcel lease provides specific hand written changes documenting a reduction of the term from seven (7) years to five (5) years with no extension.

> lands owned by Lessor. This Lease also covers and includes, in addition to that above described, in and, it any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. ~~2015~~ ~~(1/23)~~ ~~(510)~~ ~~F510~~ 8/3/15 →158.
> LEASE TERM. This Lease shall remain in force for a primary term of ~~seven (7)~~ years from 12:00 A.M. August 4, 2008 (effective date) to 11:59 P.M. August 3, ~~2015~~ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.
> If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.
> ~~EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease. Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.~~

Additionally, as the exemplars below document, the single term 5 year lease term is confirmed on the "Order of Payment" for each of the leases[3].

---

[2] The crossed out lease language is found in all of the recorded leases referenced above.
[3] All orders of payment confirm the payments made are only for a single five year term.


Bailey
& Wyant
P.L.L.C.

May 16, 2014

This payment is for a 5 year Oil and Gas Lease
dated ___11-19___ , ___2008___ , which covers property described as follows ____
Tax Map # T4/4 containing 10.68 acres

Completed by. ____
Landowner's signature. ____
Landowner's signature ____

This payment is for a 5 year Oil and Gas Lease
dated ___11-19___ , ___2008___ , which covers property described as follows ____
Tax Map # T4/4 containing 10.68 acres

Completed by. ____
Landowner's signature. ____
Landowner's signature ____

The 16 acre WTC lease parcel is confusing and misleading.  The "Order of Payment" is unsigned by the landowner, but references a seven year lease.

Ohio County, West Virginia
LEASE NUMBER    [X] New    [ ] Renewal    ADDITIONAL INFORMATION

This payment is for a 7 year Oil and Gas Lease
dated _____ , ___2008___ , which covers property described as follows:
Tax Map # T9/36.7-16 acres

Completed by: ____
Landowner's signature. ____
Landowner's signature: ____

May 16, 2014

However, the actual written lease that was signed for this parcel is technically only for one day.



Even more problematic is that the lease that was recorded was not the lease that was signed. When Chesapeake recorded the lease, the front page was surreptitiously changed without notifying the Glessner entities. *See attached.*

The Glessner entities agreed to the single 5 year term expiring in August 2013, specifically rejecting the extension of the primary term. Chesapeake failed to complete all of its operations within that term and these leases are now terminated. Without the "Extension of Primary Term" clause, the lease is incomplete and void as to the meaning of any terms that could possibly extend the term into subsequent terms. Also, the compensation for the leases reflect its short term. All of these leases were $1,000 an acre leases which is well below market value.

I have been instructed to make one effort to compromise this matter in the immediate future without the necessity of litigation. Should our efforts to compromise this dispute be unsuccessful, the proposed suit would seek to halt all Chesapeake/Statoil activity in the affected units, seek Chesapeake's immediate ejectment from the property, seek damages for damage to the property, seek restoration and reclamation damages, seek damages for slander of title, conversion, trespass, and associated damages.

These issues give me great concern that Chesapeake has a callous and disrespectful attitude toward the owners of the properties it leases in West Virginia. This cavalier attitude must end. Please contact me to discuss whether litigation can be avoided. I suggest that the parties would benefit greatly from initial exploratory discussions tailored to simply renewing the lease agreements to reflect a reasonable per acre bonus amount for another five year term and a more reasonable royalty percentage. As for the real estate taxes, the taxes should be paid immediately.



May 16, 2014

I look forward to hearing from you.

Very truly yours,

Mark A. Kepple

Enc:   Leases referenced above
       Compression Facilities Lease Agreement

